IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELIZABETH CAMPBELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 22CV4736 |
| ) | |
| CATHOLIC CHARITIES DIOCESE OF ) | Judge Lindsay C. Jenkins |
| JOLIET, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S[1] MOTION FOR SUMMARY JUDGMENT**

Catholic Charities Diocese of Joliet ("CCDOJ") is entitled to summary judgment because the "harassment" Plaintiff complained about (such as not using her preferred nickname) was not severe or pervasive and had nothing to do with her race or her religion, because most of the events she complains about were not adverse employment actions, and because Plaintiff was discharged for four months of unexcused absences and she cannot show that the reason was a pretext for race or religious discrimination. Accordingly, CCDOJ is entitled to summary judgment.

**I.      SUMMARY OF THE MATERIAL AND UNDISPUTED FACTS[2]**

CCDOJ is a faith-based organization providing services through various programs in five Illinois Counties. (Def's L.R. 56.1 Statement ¶2, hereafter "Facts ¶__") CCDOJ's programs include Head Start, Early Head Start, home-based, expectant mothers, and daycare programs for children up to five years-old and their low-income families. Children participate in developmentally and educationally appropriate activities; receive medical and dental care; have

---

[1] On May 16, 2023, this Court dismissed the claims against Kathleen Langdon. [Dkt. No. 26]

[2] Defendant's Local Rule 56.1 Statement of Material and Undisputed Facts, filed contemporaneously herewith, is hereby incorporated by reference.

healthy meals and snacks; and enjoy playing in a safe setting. Family Service Workers provide support services and assist in securing needed community resources. (Facts ¶3)

Kathleen Langston (Caucasian) is CCDOJ's Executive Director, Kathy Fudge-White (African American) is the Director of the Early Childhood Services Division of CCDOJ, in 2022 Theresa Ross (African American) was the Assistant Director of Human Resources, and Dr. Renanta Davis (African American) was the Assistant Director of Home Based Operations. (Facts ¶4) Dr. Davis was Plaintiff's direct supervisor for three or four months in 2021 and then again from April of 2022 until Plaintiff's termination. (Facts ¶5) CCDOJ also has Head Start Policy Council, which consists of parent and community representatives, that decides staff recommendations regarding the termination of CCDOJ employees. (Facts ¶6)

## CCDOJ's Policies

CCDOJ's employment policies include the following Standards of Behavior: absence from work for three (3) consecutive scheduled work days without reporting the absences and the reason(s) for the absences; continued reported absence from work without establishing a Leave of Absence approved by the Agency; and Failure to return to work at the end of an approved Leave of Absence or an approved extension of leave. (Facts ¶7) In addition, CCDOJ maintains a Nondiscrimination Policy, an Anti-Harassment Policy and a Whistleblower Policy, and Plaintiff knew of these policies. (Facts ¶8) The Anti-Harassment Policy prohibits harassment based upon protected characteristics and establishes a complaint reporting procedure. (*Id.*) Plaintiff received harassment training in the summer of 2021. (Facts ¶9)

## Plaintiff and Her Employment at CCDOJ

Plaintiff, who identifies as African American, was employed by CCDOJ from October 2001 to March 2003, and then from November 2004 to August 4 or 5, 2022. (Facts ¶¶10-11) In

2014, Plaintiff was promoted to Early Head Start Home Visitor and in 2016, her title was changed to Early Head Start Parent Child Educator. (Facts ¶12) Plaintiff's duties included engaging in "weekly home visits with all families on the assigned caseload…" (Facts ¶14)

Plaintiff's role is very important to the Head Start Program because it is the primary contact between CCDOJ and the participants in the Program. There are about 6 employees in this position and each maintains a case load of at least 12 children/families. When employees in this position are absent from work, the children/families either go unserved or if they are reassigned to another employee, then it risks overburdening the other employee, which then again often results in some Program participants not receiving appropriate or effective services. (Facts ¶13)

### Plaintiff's Attendance and Discharge

On or about March 29, 2022, Plaintiff wrote to Fudge-White, "I am spiritually, emotionally, and physically not able to do this job anymore and I am waiting on God to give me a recruitment job." (Facts ¶37) Plaintiff was then off work from April 12, 2022, through her termination on August 5, 2022. (Facts ¶15) On April 21, 2022, Ross sent Plaintiff an email reminding her of the obligation to submit a document from a medical provider after an absence of three days or more and that HR had not received such a document. (Facts ¶16) On April 22, 2022, Plaintiff submitted a doctor's note to be excused from work for one week, but the note did not provide a medical justification for the absence. (Facts ¶17) On April 22, 2022, Plaintiff also presented a doctor's note stating that she can only return to work after imaging results are received. (Facts ¶18)

On May 26, 2022, Ross wrote to Plaintiff about her "excessive absences," concluding:

> By no later than Tuesday, May 31, 2022, you must contact Human Resources and/or your direct supervisor to discuss the circumstances of your leave of absence. You must begin complying with our call-in procedures should you continue to be absent. The occasional emails and other communications you have sent us since

3

your unapproved leave of absence began are insufficient to be compliant with our policies and practices. (Facts ¶19)

On June 2, 2022, Plaintiff presented a doctor's excuse from work for another two weeks. (Facts ¶20) On June 15, 2022, Dr. Davis sent Plaintiff a letter about her continued absences, giving Plaintiff until June 22, 2022 to "contact Human Resources to discuss the circumstances of your leave of absence" and expressly warning that Plaintiff must "begin complying with our call-in procedures should you continue to be absent." (Facts ¶21) On June 16, 2022, Plaintiff failed to submit a required "fit for duty notice" and was therefore not allowed to return to work. (Facts ¶22) On the afternoon of June 16, 2022, Plaintiff was sent an email specifically reminding her to submit a document from her "medical provider stating that you are fit for duty to return to work – with or without accommodations," reminding her that her absences since April 11, 2022 remain unexcused and stating that "Absent further information, the Agency will treat these absences in accordance with its normal leave and attendance policies." (Facts ¶23)

On July 1, 2022, Plaintiff submitted a return to work note restricting her to office work only, with an estimated duration of 4-6 weeks. (Facts ¶24) She did not return to work though because she could not perform the essential job duty of home visits with that restriction. (*Id.*) On July 19, 2022, Plaintiff submitted another doctor's note, stating that she was on work restrictions until further notice. (Facts ¶25)

On or about August 2, 2022, Ross sent a letter to the Head Start Policy Council ("Policy Council") recommending that Plaintiff be discharged. (Facts ¶26) The Policy Council met on August 4, 2022; Plaintiff had to leave the meeting and it continued with her union representatives speaking on her behalf, with Plaintiff's agreement. At the conclusion of the meeting, the Policy Council voted unanimously to approve the decision to terminate Plaintiff's employment with

CCDOJ. (Facts ¶¶27-29) Plaintiff was then discharged from CCDOJ based upon her unexcused absences in 2022; her race and her religion were not factors in the decision. (Facts ¶30)

After Plaintiff's termination, she made no efforts to find new employment elsewhere. (Facts ¶52)

### Plaintiff's Harassment and Discrimination Claims

Langdon, Fudge-White and Ross have never made any derogatory comments to Plaintiff because of her race or religion, and Plaintiff has never had any issues with them. (Facts ¶35) Dr. Davis has also never made any derogatory comments to Plaintiff because of her race and has never said anything suggesting that she did not like African Americans. (Facts ¶36) CCDOJ adamantly denies that there was any illegal harassment or discrimination against Plaintiff. (Facts ¶31)

In August or September 2021, Plaintiff complained that she was being harassed and discriminated against because of her race or religion. (Facts ¶32) Then, on April 20, 2022, Plaintiff filed a Charge of Discrimination with the EEOC alleging harassment and discrimination based upon her race and religion. (Facts ¶33) Plaintiff has many complaints, including: discipline, being denied a missions trip, a promotion claim, a religious accommodation claim, a religious harassment claim, a retaliation theory, not allowing her to work from home for two days, and her discharge. (Facts ¶¶33-34)

**<u>Discipline</u>**. Plaintiff received a corrective action notice in June 2021, but she was never demoted and it did not result in the loss of any money to Plaintiff. (Facts ¶40) Plaintiff cannot recall receiving any such discipline thereafter. (*Id.*) Plaintiff also complains that after she was off work from November 2021 through January 2022, twelve of her files were subjected to review, whereas another employee only had two files reviewed. (Facts ¶50) But the other employee had not been off work for three months, and Plaintiff admits that the file review did not result in any

disciplinary or corrective action against her. (*Id.*)

**Missions Trip**. Plaintiff complains that, although she went on a mission trip in 2017, her request to go on a paid "Filipino mission trip" was denied, and she thinks that was retaliation. (Facts ¶42) However, the trip was not "open to Head Start" (Plaintiff's program) and Plaintiff cannot identify any similarly situated employee who was allowed to go. (*Id.*)

**Promotion**. Plaintiff complains that she was not promoted to a recruitment specialist position. (Facts ¶46) However, Plaintiff admits that during the term of her employment, CCDOJ was not seeking to fill a recruiter position, and Plaintiff never applied for such a position. (*Id.*)

**Religious Accommodation and Harassment**. Plaintiff alleges that Dr. Davis "stifled" Plaintiff from speaking about her religion by "just making comments or presence you know, feeling threatened because she's there, because I know she's going to have something to say or another corrective action"; however, Plaintiff admits that she was never written up for talking about her religion. (Facts ¶45) Further, Plaintiff only identified two comments from Dr. Davis about her religion: a) Plaintiff alleges that during a group video meeting in June of 2021, Dr. Davis made a comment about not knowing what to do and when Plaintiff suggested that the group pray, Davis responded with words to the effect that "you make people think that you're holier than – than the other folks" (Facts ¶38); and b) Plaintiff also claims that sometime in July or August of 2021, Dr. Davis made a statement to the effect of "leave God out of it" but Plaintiff cannot recall the context in which the statement was made. (Facts ¶41) Plaintiff testified that she could not recall any other alleged offensive comments Dr. Davis made to her after June 2021. (Facts ¶39) Plaintiff expressly testified that Dr. Davis' actions were not based on Plaintiff's race or religion, but "I look at it as harassment though." (Facts ¶47)

Finally, Plaintiff complains that Dr. Davis harassed and bullied Plaintiff when Dr. Davis

6

called her by her given name, Elizabeth, "because I like to be called Liz." (Facts ¶51) However, Dr. Davis referred to other African Americans using their preferred nicknames, and Plaintiff testified that she did not know whether calling her Elizabeth was due to Plaintiff's race or religion. (*Id.*)

**Retaliation**. Plaintiff claims that during video conference meetings, Dr. Davis (who is African American) "would let people of Caucasian race to speak up. And when it was time for me or others like me, or even some of my Hispanic brothers and sisters that – she would cut it off." (Facts ¶43) However, Plaintiff testified that she was the only one who was "cut out" of the meetings, and that she attributed it to favoritism. (*Id.*)

**Work from Home for Two Days**. Plaintiff claims that she was off work from November 2021 through January 2022, that immediately after her return to work she was required to take vacation time during a snowstorm on or about February 1-3, 2022, and that she was not allowed to work from home for two days. (Facts ¶49) But Plaintiff does not know why Dr. Davis made that decision. (*Id.*)

II. **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 291 (7th Cir. 1998). A mere scintilla of evidence does not defeat summary judgment; the party must present definite, competent, and non-conclusory evidence to rebut the motion. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016). "[A]s 'the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific,

admissible evidence showing that there is a genuine dispute of material fact for trial.'" *Price v. Int'l Paper Co.,* Slip Op. No. 17cv06097, 2020 U.S. Dist. LEXIS 189280, *5 (N.D. Ill. Oct. 13, 2020), citing *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).

### III. LEGAL ARGUMENT

#### A. Plaintiff Failed to Establish a *Prima Facie* Case of Race Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" race or religion. 42 U.S.C. § 2000e-2(a). Ultimately, to survive summary judgment on a Title VII claim, a plaintiff must point to evidence in the record that "would permit a reasonable factfinder to conclude that [the protected characteristic] caused the ... adverse employment action." *Ortiz v. Werner Enters, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Even after *Ortiz*, the burden-shifting framework from *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973), remains a helpful way of organizing the evidence in a Title VII case. *Rozumalski v. W.F. Baird & Associates*, 937 F.3d 919, 926 (7th Cir. 2019). Under the three-part *McDonnell Douglas* framework, the plaintiff has the burden to establish by a preponderance of the evidence the elements of a *prima facie* case of unlawful discrimination. *See, e.g.*, *id.* If the plaintiff establishes those elements, the burden of production shifts to the employer to articulate a legitimate reason for the adverse action. *Id.* If the employer articulates such a reason, the burden returns to the plaintiff to show that the employer's reason is pretextual. *Id.* The ultimate burden of proof is at all times on the plaintiff. *Id.*

Under *McDonnell Douglas*, to establish a *prima facie* race discrimination claim, Plaintiff must show: (1) she is a member of a protected class, (2) she met Defendant's legitimate performance expectations, (3) she suffered an adverse employment action, and (4) Defendant treated similarly-situated employees outside of Plaintiff's protected class more favorably than

8

Plaintiff. *See id.*; *see also Smiley v. Columbia College Chicago*, 714 F.3d 998, 1002 (7th Cir. 2013) ("We generally apply the same standards to Title VII and section 1981 race discrimination claims at the summary judgment stage").

"[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) (quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)).

Here, Plaintiff's termination claim fails because she cannot show that her attendance met CCDOJ's expectations. "Courts look at an employee's performance 'through the eyes of [his] supervisors.' *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). 'An employee who violates his employer's established policies fails to perform adequately or meet his employer's legitimate expectations.'" *Hall v. Vill. Of Flossmore Police Department*, 2012 LEXIS 171439, at *15 (N.D. Ill. December 4, 2012), *aff'd* 520 F. App'x 468 (7th Cir. 2013). Plaintiff's four months of unexcused absence did not satisfy CCDOJ's attendance requirements. *See Jovanovic v. In-Sink-Erator Division of Emerson Elec. Co.*, 201 F.3d 894, 899-900 (7th Cir. 2000) ("Common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job"). Immediately after telling her supervisor that she cannot perform her job anymore, she was absent from work, without excuse, for the next four months. Thus, Plaintiff cannot establish a *prima facie* claim of discrimination relating to her discharge.

Plaintiff's remaining race discrimination claims fail because she cannot satisfy the adverse employment action element of a *prima facie* case regarding any of those actions. For example,

9

Plaintiff cannot prevail on her failure-to-promote claim because Plaintiff acknowledges that a recruiter position was not open or posted nor did she apply for such a position. *E.g. Riley v. Elkhart Community Schools*, 829 F.3d 886, 892 (7th Cir. 2016) (plaintiff "cannot prove a *prima facie* case ... because she never applied for the positions" and, therefore, defendant "could not have rejected her"); *Jones v. City of Springfield*, 554 F.3d 669, 673 (7th Cir. 2009) ("in a failure-to-promote claim, a prima facie [*sic*] case presupposes the existence of an open position").

Plaintiff also cannot show that the corrective action notice she received in June 2021 was actionable because a negative performance review, unaccompanied by a tangible job consequence, does not constitute an adverse employment action. *E.g. Grube v. Lau Industries, Inc.*, 257, F.3d 723, 729 (7th Cir. 2001); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) ("This circuit already has concluded that negative performance evaluations, standing alone, cannot constitute an adverse employment action"). Similarly, having her files reviewed is not an adverse employment action. The same applies to her claims about the mission trip, and being required to use two days of vacation rather than work from home.

### B. Plaintiff Failed to Establish a *Prima Facie* Case of Retaliation

To establish a retaliation claim under Title VII or Section 1981, Plaintiff must show: (1) she engaged in activity protected under Title VII and/or Section 1981, (2) she suffered an adverse employment action, and (3) there is a causal connection between Plaintiff's protected activity and the adverse employment action. *See Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001); *see also Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007) (applying Title VII *prima facie* requirements to a retaliation claim under Section 1981). "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. SW Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

"'Merely complaining in general terms of discrimination or harassment, without indicating

a connection to a protected class or providing facts sufficient to create that inference, is insufficient' to state a claim for retaliation." *Hoosier v. Greenwood Hospitality Management LLC*, 32 F. Supp. 3d 966, 982 (N.D. Ill. 2014) (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). Moreover, Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Outley v. City of Chicago*, 354 F. Supp. 3d 847, 869 (N.D. Ill. 2019).

"A materially adverse employment action is one where the plaintiff suffers "a significant change in employment status." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). In other words, "an employer's action will be actionable … if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Whittaker v. Northern Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005); *see also Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371 (7th Cir. 2020).

Here, there are three actions that Plaintiff complains about that occurred after she complained in August or September of 2021: having her files reviewed when she returned from a three month absence, not being allowed to work from home for two days, and her termination. As to the first two, Plaintiff cannot show that they were materially adverse actions or that they were causally connected to any protected characteristic. As to her termination, Plaintiff cannot show any causal connection to her discharge a year after her internal complaint or more than three months after her EEOC Charge. *E.g. Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) ("For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action").

11

### C. Even if Plaintiff Established a *Prima Facie* Case of Discrimination or Retaliation, Plaintiff Failed to Establish Pretext

Assuming *arguendo* that Plaintiff could establish a *prima facie* case of discrimination and/or retaliation—which she cannot—"the burden shift[s] to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). "In determining whether an employer's stated reason is pretextual, 'the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain'" the adverse employment action. *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 311 (7th Cir. 2012).

Here, Plaintiff cannot show pretext. There is simply no question that discharge of an employee who has been absent for four months after telling her supervisor that she cannot do her job anymore is a non-discriminatory reason for Plaintiff's discharge. Likewise, the lack of an open position bars any pretext argument regarding the promotion claim. *E.g. Jones v. City of Springfield*, 554 F.3d 669, 673 (7th Cir. 2009) ("The lack of an opening is always a legitimate reason for refusing to hire or promote"). Finally, reviewing all of the files of an employee who has been off work for three months is objectively reasonable, and to decline "work from home" for an employee whose job required the employee to be working in the field and who had just been on a three-month absence does not suggest discrimination or retaliation or retaliation for a complaint made 4-5 months prior. Plaintiff's discrimination and retaliation claims fail for these additional, independent reasons.

### D. Plaintiff Failed to Establish a Failure-to-Accommodate Religious Discrimination Claim

Title VII "require[s] an employer to make reasonable efforts to accommodate the religious practices of employees unless doing so would cause the employer an undue hardship." *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012). To establish a claim of religious discrimination based on Defendant's alleged failure to reasonably accommodate Plaintiff's religion, Plaintiff must first show: (1) "the observance or practice conflicting with an employment requirement is religious in nature," (2) "that she called the religious observance or practice to [Defendant's] attention," and (3) "that the religious observance or practice was the basis for her discharge or other discriminatory treatment." *Id.* Once Plaintiff establishes a *prima facie* case, "the burden shifts to the employer to ... show that any reasonable accommodation would result in undue hardship" to Defendant. *Id.* "A reasonable accommodation of an employee's religion is one that 'eliminates the conflict between employment requirements and religious practices.'" *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir. 1993). Here, the only apparent accommodation Plaintiff sought was her request to take over a group meeting to lead the participants in prayer in June 2021, and refusing her request did not result in discriminatory treatment, especially where Plaintiff admits that she was not otherwise restricted from praying at work. (Facts ¶48)

### E. Plaintiff Failed to Establish Actionable Harassment

To establish a race or religious harassment claim, Plaintiff must prove "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993) (internal quotations and citation omitted). Whether conduct is sufficiently severe or pervasive to create a hostile work environment depends on "the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Here, Plaintiff's harassment claim is based upon: a) her supervisor called her Elizabeth rather than Liz; b) two comments relating to religion ("holier than" and "leave God out of it"); and having all of her files reviewed when she returned from a three-month absence. These simply do not rise to the level of an abusive working environment and therefore do not constitute actionable harassment.

### F. Even if Plaintiff Established Actionable Harassment, Plaintiff Failed to Establish a Basis for Employer Liability

Where, as here, alleged harassment by a supervisor does not culminate in a tangible employment action, Defendant cannot be liable if "it exercised reasonable care to prevent and correct promptly any ... harassing behavior," and Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm." *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 628 (7th Cir. 2019) (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998)). "While not required as a matter of law, the existence of an appropriate anti-harassment policy will often satisfy this first prong because 'Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms.'" *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999) (internal citations omitted). Further, "demonstrating a plaintiff failed to use the provided reporting procedures 'will normally suffice to satisfy the employer's burden under the second [prong] of the defense." *Hunt*, 931 F.3d at 631; *see also Parkins v. Civil Constructors*, 163 F.3d 1027, 1038 (7th Cir. 1998) ("'the law against ... harassment is not self-enforcing' and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists.").

Here, Plaintiff cannot show that she complained about being called Elizabeth and she cannot show that any of the other things she complains about continued to occur after she

14

complained about them. Accordingly, even if the actions were based upon race or religion, Plaintiff cannot show a basis for employer liability.

### F. Plaintiff Failed to Mitigate Her Alleged Damages

Finally, even if Plaintiff could maintain some theory of liability relating to her discharge (which she cannot), she is not eligible for any back pay or front pay damages because she admitted that after her discharge, she made no effort to seek comparable employment. The Seventh Circuit has "cautioned that a person discharged--even illegally--cannot simply refuse to seek other employment…" *Mattenson v. Baxter Healthcare*, 438 F.3d 763, 771 (7th Cir. 2006). Plaintiff's "failure to mitigate [her] damages by seeking substitute employment was unreasonable and bars" her claim for damages relating to her discharge. *Franzen v. Ellis Corp.*, 543 F.3d 420, 429-30 (7th Cir. 2008). Accordingly, even if termination claim survives summary judgment (which it should not), CCDOJ is entitled to judgment on any damages claims relating to Plaintiff's discharge.

## IV. CONCLUSION

The bottom line is although Plaintiff has made a great variety of claims, none of them are sufficient to maintain this action. Accordingly, Defendant asks that this Court enter summary judgment in its favor and against Plaintiff on all of her claims.

Date: January 30, 2024                                              Catholic Charities Diocese of Joliet

By:  s/ Jeffrey S. Fowler
       One of Its Attorneys

Jeffrey S. Fowler (6205689)
Laner Muchin, Ltd.
515 North State Street, Suite 2400
Chicago, Illinois 60654
(312) 467-9800
jfowler@lanermuchin.com

**CERTIFICATE OF SERVICE**

    I, the undersigned attorney, hereby certify that I caused the foregoing Memorandum of Law in the above-captioned matter to be served on the parties of record listed below, U.S. mail, first-class postage prepaid, and through the functions of the Court's ECF system, on this 30th day of January, 2024, addressed to:

> Elizabeth Campbell
> 202 Northridge Ave.
> Bolingbrook, IL 60440
> (630) 674-8799
> prayingmom13@gmail.com

        /s/ *Jeffrey S. Fowler*