UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Elizabeth Campbell, *Plaintiff*, v. Catholic Charities Diocese of Joliet, *Defendant*. | No. 22 CV 4736 Judge Lindsay C. Jenkins |

MEMORANDUM OPINION AND ORDER

Elizabeth Campbell filed suit *pro se* against her former employer, Catholic Charities Diocese of Joliet ("Catholic Charities"), for racial and religious discrimination in violation of Title VII of the Civil Rights Act and 42 U.S.C. § 1981. Catholic Charities has moved for summary judgment on all claims. Because Campbell has presented no evidence that would allow a reasonable jury to find in her favor, the Court grants the motion.

I.  **Local Rule 56.1**

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material

1

controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3).

Any party, including a *pro se* litigant, who fails to comply with Local Rule 56.1 does so at their own peril. *Wilson v. Kautex, Inc.*, 371 Fed. Appx. 663, 664 (7th Cir. 2010) ("strictly enforcing Local Rule 56.1 was well within the district court's discretion, even though employee was *pro se* litigant"); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("even pro se litigants must follow procedural rules"); *Parker v. Fern*, 2024 WL 1116092, at *2 (N.D. Ill. Mar. 14, 2024) ("It is well-settled that a plaintiff's *pro se* status does not excuse him from complying with federal and local procedural rules.").

Here, Catholic Charities filed a Rule 56.1 statement, and as required by Rule 56.2, served Campbell with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment." [Dkts. 36, 37.] This latter filing explains what a motion for summary judgment is, and what steps Campbell needed to take to respond to the motion. Notwithstanding these instructions, Campbell failed to file a response to Catholic Charities's statement of material facts. Nor did she file any additional facts. L.R. 56.1(b)(3). Consequently, the Court takes all its facts from Catholic Charities and deems them admitted to the extent they are supported by evidence in the record. L.R. 56.1(e)(3); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

## II. Background

Catholic Charities is a faith-based organization that provides various programs and services for low-income families with young children, including the "Head Start" program. [Dkt. 36 ¶¶ 2-3.] During the relevant timeframe at Catholic

2

Charities, Kathleen Langston (Caucasian) was Executive Director; Theresa Ross (African American) was Assistant Director of Human Resources; Kathy Fudge-White (African American) was Director of Early Childhood Services; and Dr. Renata Davis (African American) was the Assistant Director of Home-Based Operations, as well as Campbell's direct supervisor. The organization also had a "Head Start Policy Council" (the "Council") which considered staff recommendations on employment decisions. [*Id.* ¶¶ 4-6.]

Campbell, who is African American, worked at Catholic Charities from November 1, 2004, until she was terminated on August 5, 2022. From August 2016 until her termination, Campbell held the position of "Early Head Start Visitor/Parent Child Educator" ("Head Start Educator"). [*Id.* ¶¶ 10-12.]

This role is "very important" to Catholic Charities because these employees are the primary points of contact between the organization and families. Each of the six Head Start Educators at Catholic Charities is expected to maintain a case load of at least 12 families. When a Head Start Educator is absent, the needs of those families go unmet unless another Head Start Educator can cover. Head Start Educators are expected to meet every week with each of the families on their caseload. [*Id.* ¶¶ 13-14.]

Catholic Charities maintains "Standards of Behavior", which admonish employees that discipline, including termination, may occur for any of the following reasons:

> Absence from work for three (3) consecutive scheduled work days without reporting the absences and the reason(s) for the absences;

3

> Continued reported absence from work without establishing a Leave of Absence approved by the Agency; and Failure to return to work at the end of an approved Leave of Absence or an approved extension of leave.

[*Id.* ¶ 7.]

Campbell did not work a single day between April 12, 2022, and August 5, 2022. [*Id.* ¶ 15.] After nearly two weeks of unexcused absence, Ross emailed Campbell reminding her of her obligation to submit documentation from a medical provider validating her leave. [*Id.* ¶ 16.] Campbell responded the following day, April 22, with two notes from medical providers. The first stated Campbell should be excused from work for one week, but did not provide a medical justification as to why. The second stated Campbell could not return to work until her "imaging" results were received. [*Id.* ¶¶ 17-18.]

Ross followed up with Campbell on May 26, 2022, telling her she needed to contact Catholic Charities's Human Resources department to explain the circumstances surrounding her month-plus absence, and that going forward Campbell must comply with the organization's policies regarding absences. Campbell's response came on June 2, 2022, in the form of another doctor's note excusing her from work for two weeks without further elaboration. Dr. Davis emailed Campbell again two weeks later requiring her to contact Human Resources to properly explain her prolonged absence and begin adhering to policy. [*Id.* ¶¶ 19-21.]

On July 1, 2022, Campbell submitted a return to work note which cryptically stated she could work, but only in an office setting. Catholic Charities did not permit Campbell to work under these restrictions, however, because a Head Start Educator must travel to her families' homes. Campbell produced another note on July 19, 2022,

4

stating Campbell could not work until further notice. [*Id.* ¶¶ 24-25.] Campbell still declined to explain the nature of her absence, nor call to report her daily absences.

Ross sent a letter to the Council on August 2, 2022, recommending the organization terminate Campbell's employment. The Council held a meeting two days later, which included Council members, Ross, Campbell, Campbell's union representative and at least one other union member. Ross explained to the Council why Campbell's long-term, unexplained absences made termination appropriate. The Council unanimously voted to terminate Campbell at the meeting's conclusion, which became effective on August 5, 2022. [*Id.* ¶¶ 26-30.]

Campbell's absence did not occur in a vacuum, however. On April 20, 2022—one week after she stopped going to work—Campbell filed a Charge of Discrimination with the EEOC alleging Catholic Charities discriminated against and harassed her based on her race and religion. Campbell alleged her employer failed to promote her, failed to reasonably accommodate her religion, would not stop harassment against her, and retaliated against her for trying to assert her rights. These allegations were not entirely unknown to Catholic Charities, as Campbell complained of discrimination and harassment on these grounds in the fall of 2021. [*Id.* ¶¶ 32-33.] The EEOC issued Campbell's right to sue letter on June 10, 2022. [Dkt. 10 at 1.][1]

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

Despite these allegations, repeated in Campbell's amended complaint, she admitted to the following in her deposition[2]: Campbell has never had any issues with Langdon, Fudge-White, or Ross, and none of these employees ever made derogatory comments about Campbell's race or religion. [Dkt. 36 ¶ 35.] She also told Fudge-White on March 29, 2022, she was "spiritually, emotionally, and physically not able to do this job anymore." [*Id.* ¶ 37.]

The source of Campbell's allegations appears to be Dr. Davis. Campbell testified Dr. Davis told her she "makes people think that [she's] holier than … other folks" after Campbell suggested they pray, and told Campbell to "leave God out of" a situation. [*Id.* ¶ 38-39, 41.] Campbell also avers Dr. Davis would only let Caucasians speak up during meetings. These were the only incidents Campbell believes constituted discriminatory conduct. [*Id.* ¶¶ 43-44.] Campbell admitted Dr. Davis (who is African American) never commented negatively on Campbell's race nor said she does not like other African Americans. [*Id.* ¶ 36.]

Campbell also alleges Dr. Davis harassed her. She points to Dr. Davis refusing to permit Campbell to list "recruitment specialist" on her professional development form, but Campbell could not say this stemmed from Dr. Davis's animosity towards Campbell's race or religion. The "recruitment specialist" position also serves as the

---

[2] After the motion for summary judgment was fully briefed, Catholic Charities requested that the Court stay ruling on the motion for thirty days to allow Campbell an opportunity to review and propose changes to her deposition transcript pursuant to Federal Rule of Civil Procedure 30(e)(1). [Dkt. 44.] The Court granted the motion, but Campbell made no changes to deposition transcript during that period. [Dkts. 45, 47.] Because her operative pleading and response brief are bereft of specific details, and she did not file a Rule 56.1 statement, the Court relies on Campbell's deposition to ascertain her version of events.

basis for Campbell's failure-to-promote claim, but she admits Catholic Charities was not seeking to fill this role during her employment, and that she never applied for the position. [*Id.* ¶ 46-47.] In addition, Campbell alleges Dr. Davis harassed her by calling her "Elizabeth" instead of her preferred "Liz", but again, could not go so far as to say Dr. Davis did this because of her race or religion.

Finally, Campbell alleges she suffered discrimination when Catholic Charities applied additional scrutiny to her performance review as compared to an unnamed white colleague. [*Id.* ¶ 34.] This review led Catholic Charities to issue a corrective action notice to Campbell, though Campbell was not demoted, nor received a reduced salary. [*Id.* ¶ 40.]

Catholic Charities now moves for summary judgment.

### III. Analysis

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In its briefing, Catholic Charities thoroughly analyzes all potential claims Campbell attempted to bring in her amended complaint—race discrimination, retaliation, failure to accommodate religious beliefs and harassment—and shows why summary judgment is proper for each. [Dkts. 35, 43.]

Campbell's response lacks legal argument or concrete factual support, which is enough to sink her claims. [*See* Dkt. 42]; *Rahn v. Bd. of Trs. of N. Ill. Univ.*, 803 F.3d 285, 295 (7th Cir. 2015) (a party that fails "to cite any legal authority in support of their argument" waives it). Campbell instead relies on conclusory statements such as "Ms. Campbell, an African American employee, was subjected to intentional harassment, reprimands, and unwarranted scrutiny that were not similarly imposed on her white colleagues" and "Ms. Campbell's rights to religious freedom were infringed upon through a series of discriminatory actions, including denial of accommodation, harassment, and retaliation for asserting her protected rights." [Dkt. 42 at 2.] But Campbell fails to take the required next step and describe those actions; she fails to identify what evidence she has "that would convince a trier of fact to accept [her] version of events." *Wade*, 26 F.4th 440 at 446. Campbell essentially attempts to rely on her pleadings, but this is insufficient at the summary judgment stage. *Flint v. City of Belvidere*, 791 F.3d 764, 769 (7th Cir. 2015) ("a party may not rest upon the mere allegations of his pleading" to defeat summary judgment).

While summary judgment on Campbell's claims is proper for this reason alone, the Court's analysis compels the same conclusion. Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Put differently, "if changing the employee's" race or other protected characteristic "would have yielded a different choice by the employer," then "a statutory violation has occurred." *Bostock v. Clayton Cty. Ga.*, 140 S. Ct. 1731, 1741 (2020).

Campbell is a member of a protected class because she is African American and Christian, and she suffered an adverse employment action because she was terminated.[3] The sole question for the Court then is "whether the evidence would permit a reasonable factfinder to conclude that" Campbell's race or religion "caused the discharge." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). To satisfy the causation element, Campbell needed to use either the burden-shifting method under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the holistic method under *Ortiz*, 834 F.3d 760. Catholic Charities opted to establish summary judgment through the *McDonnell Douglas*, which Campbell did not address in her response.

Under the *McDonnell Douglas* burden shifting framework, the plaintiff has the "initial burden to establish a prima facie case of discrimination" by showing that 1) she is a member of a protected class; 2) she was meeting his employer's legitimate job expectations; 3) she suffered an adverse employment action; and 4) similarly situated

---

[3] While Campbell's religion is not listed in her amended complaint, she testified she was a Baptist during her deposition. [Dkt. 36-2 at 43:8-16.] It is not clear whether any of Catholic Charities's employees knew Campbell was Baptist.

9

employees outside her protected class were treated more favorably. *Wince*, 66 F.4th at 1040.

Campbell fails to meet her initial burden. There can be no dispute Campbell did not meet Catholic Charities's legitimate job expectations—she did not show up to work for over three months. And although Campbell periodically submitted vague notes in an attempt to justify her absence, she failed to explain why she was absent or to properly seek absences pursuant to the organization's policies and repeated warnings. Simply put, Campbell persistently violated Catholic Charities's explicit policies (which required employees to show up to work), such that she was not meeting expectations. *Jovanovic v. In-Sink-Erator Division of Emerson Elec. Co.*, 201 F.3d 894, 899-900 (7th Cir. 2000) ("Common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, [s]he is usually unable to perform [her] job"); *Hall v. Vill. of Flossmoor Police Dep't*, 2012 WL 6021659, at *5 (N.D. Ill. Dec. 4, 2012) ("An employee who violates his employer's established policies fails to perform adequately or meet his employer's legitimate expectations") (citing *Anders v. Waste Mgmt. of Wisc.*, 463 F.3d 670, 676 (7th Cir.2006)).

Campbell likewise presents no evidence establishing that there were any "similarly situated employees" outside her class who were treated better than her, so she cannot establish a *prima facie* case of race or religious discrimination for that reason either.

Campbell's retaliation and harassment claims fare no better. "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. SW Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); *see also Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.")

Here, Campbell has not identified retaliatory or harassing events based on her race or religion that a reasonable jury could find were tied to her termination. Dr. Davis's alleged isolated statements telling Campbell she acted "holier" than others and to "leave God out of" an issue are in no way connected to any alleged employment action. Moreover, "stray remarks" are "insufficient to establish that a particular decision was motivated by discriminatory animus" particularly because Dr. Davis was not involved in the decision to terminate Campbell; that decision was left to the Council. *Outley v. City of Chicago*, 354 F.Supp.3d 847, 866 (N.D. Ill. 2019).

Campbell's failure-to-promote claim fails for the simple reasons that the recruitment specialist position she identifies was not available during her employment, and she never applied for the job. *Jones v. City of Springfield*, 554 F.3d 669, 673 (7th Cir. 2009) ("in a failure-to-promote claim, a *prima facie* case presupposes the existence of an open position"); *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016) (a plaintiff who does not apply to a job cannot establish a

11

*prima facie* failure-to-promote claim because the employer could not have rejected her).

Similarly, summary judgment is proper on her failure-to-accommodate religious discrimination claim both because Campbell has failed to explain what accommodation she was seeking, and because she admits she was never told that she was not allowed to pray or otherwise practice her faith. [Dkt. 36 ¶ 48.]

The discussion above is by no means an exhaustive list of every way Campbell's claims fail—there are others. But it is beyond dispute that Campbell has failed to raise any triable issue of fact such that Catholic Charities is entitled to summary judgment all of Campbell's claims.[4]

### IV. Conclusion

For the foregoing reasons, Catholic Charities's motion for summary judgment is granted.

Enter: 22 CV 4736
Date: May 9, 2024

Lindsay C. Jenkins
United States District Judge

---

[4] *Ortiz* holds that "all evidence belongs in a single pile and must be evaluated as a whole." 834 F.3d at 766. Nothing Campbell has identified constitutes sufficient evidence of race or religious discrimination; even in a pile, it does not amount to evidence from which a jury could reasonably conclude that any alleged discrimination was because of membership in a protected class or on account of her religion.